IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| BOARD OF TRUSTEES OF THE WESTERN STATES OFFICE AND PROFESSIONAL EMPLOYEES PENSION FUND,<br><br>         Plaintiff,<br><br>   v.<br><br>WELFARE & PENSION ADMINISTRATION SERVICE, INC.,<br><br>         Defendant. | Case No. 3:19-cv-00811-SB<br><br>**OPINION AND ORDER** |

**BECKERMAN, U.S. Magistrate Judge.**

This matter comes before the Court on plaintiff Board of Trustees of the Western States Office and Professional Employees Pension Fund (the "Board") and defendant Welfare and Pension Administration Service, Inc.'s ("WPAS") cross-motions for summary judgment. The Court has jurisdiction over this matter pursuant to 29 U.S.C. §§ 1401 and 1451, and both parties have consented to the jurisdiction of a U.S. Magistrate Judge pursuant to 28 U.S.C. § 636. For the reasons explained below, the Court denies the Board's motion for summary judgment and grants WPAS's cross-motion for summary judgment.

///

PAGE 1 – OPINION AND ORDER

## BACKGROUND

### I. ERISA STATUTORY FRAMEWORK

"Congress designed [the Employee Retirement Income Security Act ("ERISA")] to regulate both single employer and multiemployer private pension plans." *Bd. of Trs. of IBT Local 863 Pension Fund v. C&S Wholesale Grocers, Inc.*, 802 F.3d 534, 536 (3d Cir. 2015) (citation omitted). The parties' dispute concerns a multiemployer pension plan. (Decl. Jeremy Roller Supp. Def.'s Resp. & Cross-Mot. Summ. J. ("Roller Decl.") Ex. A-1, at 2, ECF No. 17-1.)

"A significant drawback of multiemployer pension plans is that 'the possibility of liability upon termination of a plan create[s] an incentive for employers to withdraw from weak multiemployer plans.'" *C&S Wholesale*, 802 F.3d at 536 (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 608 (1993)). If "an employer withdraws from a pension plan before fully funding the amounts attributable to its employees, the plan's contribution base is reduced and the remaining contributing employers have no choice but to absorb the higher costs through increased contribution rates." *Id.* (citing *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 216 (1986)). That in turn could "jeopardize the plan's survival because the remaining employers have an increased incentive to also withdraw." *Id.*

To address this risk, Congress amended ERISA by enacting the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA"). *C&S Wholesale*, 802 F.3d at 536-37 (citation omitted). The MPPAA provides that "when an employer completely withdraws from a multiemployer pension plan, it incurs withdrawal liability that corresponds to the value of the benefits in the plan that have vested and are attributable to its employees." *Id.* at 537. Section 1391(c)(3) "provides the formula with which a plan's actuaries are to calculate the amount of this liability." *Id.*

PAGE 2 – OPINION AND ORDER

Under the MPPAA, an employer can satisfy its entire withdrawal liability by, among other things, "amortiz[ing] the debt in equal annual payments[.]" *Id.* Section 1399(c)(1)(C)(i) provides the following two-part formula for calculating the amount of these annual payments:

> [T]he amount of each annual payment shall be the product of—
>
> (I) the average annual number of *contribution base units* for the period of 3 consecutive plan years, during the period of 10 consecutive plan years ending before the plan year in which the withdrawal occurs, in which the number of contribution base units for which the employer had an *obligation to contribute* under the plan is the highest, and
>
> (II) the *highest contribution rate* at which the employer had an *obligation to contribute* under the plan during the 10 plan years ending with the plan year in which the withdrawal occurs.

29 U.S.C. § 1399(c)(1) (emphasis added).[1] The term "contribution base units" is generally understood to mean "the compensable or paid hours for which an employer contributes to the plan on behalf of its employees." *C&S Wholesale*, 802 F.3d at 537. The term "obligation to contribute" means an obligation "arising (1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law." 29 U.S.C. § 1392(a).

In 2006, Congress further amended ERISA by enacting the Pension Protection Act (the "PPA"). The purpose of this amendment was "'to protect and restore multiemployer pension plans in danger of being unable to meet their pension distribution obligations in the near future.'" *C&S Wholesale*, 802 F.3d at 538 (quoting *Trs. of the Local 138 Pension Tr. Fund v. F.W. Honerkamp Co., Inc.*, 692 F.3d 127, 130 (2d Cir. 2012)). Under the PPA, "a multiemployer pension plan that is less than 65 percent funded is in 'critical status.'" *Id.* The PPA "imposes an

---

[1] An employer's "annual payments are capped at 20 years even if more than 20 annual payments would be required to completely satisfy [its] withdrawal liability." *C&S Wholesale*, 802 F.3d at 542.

PAGE 3 – OPINION AND ORDER

automatic surcharge from 30 days after the employer has been notified that the plan is in critical status[.]" *Id.* (citing 29 U.S.C. § 1085(e)(7)). The surcharge is equal to five percent of the contributions required under the collective bargaining agreement ("CBA") in the first year and fixed at ten percent in subsequent years. *Id.* (citing 29 U.S.C. § 1085(e)(7)). The PPA provides that "[a]ny surcharges under paragraph (7) shall be disregarded in determining the allocation of unfunded vested benefits to an employer under section 1391, except for purposes of determining the unfunded vested benefits attributable to an employer under section 1391(c)(4) or a comparable method approved under section 1391(c)(5)."[2] *Id.* (quoting 29 U.S.C. § 1085(e)(9)(B) (2008)).

In 2014, Congress passed the Multiemployer Pension Reform Act ("MPRA"). *C&S Wholesale*, 802 F.3d at 538. The MPRA amended § 1085, which now states that "automatic surcharges [shall] 'be disregarded in determining the allocation of unfunded vested benefits to an employer under [29 U.S.C. § 1391] *and in determining the highest contribution rate* under [29 U.S.C. § 1399(c)].'" *Id.* at 546 (quoting 29 U.S.C. § 1085(g)(2) (2014)).

## II.    FACTUAL AND PROCEDURAL HISTORY[3]

In 2016, WPAS completely withdrew from the Western States Office and Professional Employees Pension Fund (the "Fund"), a multiemployer pension plan subject to ERISA. (Roller Decl. Ex. A-1, at 2-3.) The CBA under which WPAS contributed to the Fund established an hourly contribution rate of $2.95 effective April 1, 2010, and the Fund had been in "critical

---

[2] Congress amended the PPA in 2008. *C&S Wholesale*, 802 F.3d at 546. Prior to 2008, the PPA provided that "'[a]ny surcharges . . . shall be disregarded in determining an employer's withdrawal liability under section 1391 of this title[.]" *Id.* (quoting 29 U.S.C. § 1085(e)(9)(B) (2006)).

[3] The material facts are undisputed. (*See* Def.'s Resp. & Cross-Mot. Summ. J. at 11, "The Parties agree that no material facts are in dispute and that this case presents a pure question of law.")

status," as defined by the PPA, since January 1, 2009. (Decl. Robert Miller Supp. of Pl.'s Mot. Summ. J. ("Miller Decl.") Ex. 1, at 19, ECF No. 15-1; Roller Decl. Ex. A-1, at 2; Miller Decl. Ex. 2, at 1.) As a result, WPAS paid a surcharge fixed at 10 percent of its contributions before withdrawing from the Fund. (*See* Roller Decl. Ex. A-3, at 18.)

After WPAS withdrew from the Fund, the Board calculated WPAS's withdrawal liability (i.e., the amount of unfunded vested benefits that WPAS owed under 29 U.S.C. § 1391(c)(3)). (Miller Decl. Ex. 3, at 1-24.) The parties do not dispute that the amount WPAS owes is $24,436,947. (*See* Miller Decl. Ex. 3, at 1, determining that WPAS's "total withdrawal liability is $24,436,947"; *see also* Def.'s Resp. & Cross-Mot. Summ. J. at 5, explaining that the Board "assessed WPAS's withdrawal liability in the amount of $24,436,947," and that the Board's "assessment of [WPAS's] withdrawal liability amount is not at issue in this case").

WPAS elected to make annual payments, and the Board calculated WPAS's annual payments using the formula provided by 29 U.S.C. § 1399(c)(1). (*See* Miller Decl. Ex. 3, at 20.) The Board used two figures to calculate WPAS's annual withdrawal liability payments. First, the Board used the average annual hours/contribution units in the highest three consecutive years during the ten years preceding WPAS's withdrawal (296,213).[4] (Miller Decl. Ex. 3, at 20.) Second, the Board assessed WPAS's "highest contribution rate" by selecting WPAS's single highest hourly contribution rate under the CBA ($2.95 per hour) and adding the 10 percent surcharge that WPAS had been paying, which produced a total contribution rate of $3.245. (*See* Miller Decl. Ex. 3, at 20.) The Board's resulting calculation under 29 U.S.C. § 1399(c)(1) was an annual withdrawal liability payment of $961,211 (296,213 units multiplied by the $3.245 contribution rate). (Miller Decl. Ex. 3, at 20.)

---

[4] It is undisputed that the Board "accurately calculated" this figure. (Def.'s Resp. & Cross-Mot. Summ. J. at 11.)

PAGE 5 – OPINION AND ORDER

Case 3:19-cv-00811-SB    Document 29    Filed 05/19/20    Page 6 of 18

WPAS disputed the Board's methodology to calculate its highest contribution rate. WPAS's position is that the Board should not have included the 10 percent surcharge in calculating its annual withdrawal liability payment. The parties submitted their dispute to an arbitrator, framed as follows:[5]

> 1. Whether in calculating WPAS's 'highest contribution rate at which the employer had an obligation to contribute under the plan' under ERISA . . . , [the Board] erred in including a 10% employer surcharge imposed under the [PPA].
>
> 2. If [the Board] is found to have erred in including a 10% employer surcharge in calculating the highest contribution rate, determination of the appropriate remedy.

(Roller Decl. Ex. A-1, at 2.)

The arbitrator found that the Board should not have included the 10 percent surcharge in calculating WPAS's annual withdrawal liability payment. (Roller Decl. Ex. B, at 1-10, Ex. C, at 1-11.) The arbitrator therefore granted WPAS's motion for summary judgment, denied the Board's cross-motion for summary judgment, and directed the Board to "recalculate WPAS's annual withdrawal liability payment using $2.95 per hour rather than $3.245 per hour as the highest contribution rate permitted under . . . 29 U.S.C. § 1399(c)(1)[.]" (Roller Decl. Ex. C, at 10.)

The Board timely filed the present action seeking to vacate the arbitrator's award. *See* 29 U.S.C. § 1401(b)(2) ("Upon completion of the arbitration proceedings in favor of one of the parties, any party thereto may bring an action . . . in an appropriate United States district court in accordance with section 1451 of this title to enforce, vacate, or modify the arbitrator's award.").

---

[5] Section 1401(a)(1) provides that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration." 29 U.S.C. § 1401(a)(1).

PAGE 6 – OPINION AND ORDER

## ANALYSIS

**I.    STANDARD OF REVIEW**

"The clear authorization of 29 U.S.C. § 1401(b)(2) for judicial review 'to enforce, vacate, or modify the arbitrator's award' gives [the] court a right to review an arbitrator's legal rulings." *Trs. of Amalgamated Ins. Fund v. Geltman Indus., Inc.*, 784 F.2d 926, 928 (9th Cir. 1986) (citing *Republic Indus. v. Teamsters Joint Council*, 718 F.2d 628, 641 (4th Cir. 1983)). An arbitrator's factual findings are "presumed correct," but the court "may review *de novo* all conclusions of law." *Id.* (citing *Bd. of Trs. v. Thompson Bldg. Materials, Inc.*, 749 F.2d 1396, 1405-06 (9th Cir. 1984)). "Statutory interpretation is a question of law subject to *de novo* review." *Id.* (citation omitted).

**II.   DISCUSSION**

The question presented is whether the arbitrator erred by concluding that it was improper for the Board to include the 10 percent surcharge in calculating WPAS's annual withdrawal liability payment. WPAS correctly notes that every court to address the issue has held, as the arbitrator did here, that the highest contribution rate should not include the PPA surcharge. *See, e.g.*, *C&S Wholesale*, 802 F.3d at 543-47 (concluding that the district court "correctly held that the 10 percent surcharge should not be included in [the employer's] annual payment of its withdrawal liability"); *Am. B.D. Co. v. Local 863 Int'l Bhd. of Teamsters Pension Plan*, No. 13-3699 (KSH) (CLW), 2016 WL 287081, at *2 (D. N.J. Jan. 2, 2016) (applying *C&S Wholesale* and affirming arbitrator's award based on the defendant's concession that "the Third Circuit's decision 'authoritatively decides the question of whether the Pension Fund may, pursuant to 29 U.S.C. § 1085(e)(7), collect a ten percent (10%) surcharge on American B.D. Company's quarterly withdrawal liability payments, and has answered that question in the negative'"). As explained below, the Court finds that the arbitrator correctly applied the law here.

PAGE 7 – OPINION AND ORDER

A.    **Annual Payment Calculation**

1.    **Statutory Interpretation**

The Court's review of the arbitrator's decision requires it to interpret several ERISA provisions. "In ERISA cases, '[a]s in any case of statutory construction, [the Court's] analysis begins with the language of the statute. And where the statutory language provides a clear answer, it ends there as well.'" *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 254 (2000) (ellipses omitted) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999)). The Court's analysis begins with the assumption that the statutory language's ordinary meaning accurately expresses the legislative purpose. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) ("Statutory construction must begin with . . . the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.").

It is undisputed that WPAS completely withdrew from the Fund, that WPAS incurred withdrawal liability in the amount of $24,436,947, and that WPAS elected to amortize the debt in equal annual payments, pursuant to 29 U.S.C. § 1399(c)(1). What is disputed is whether the Board properly calculated WPAS's annual payments. Section 1399(c)(1)(C)(i) sets forth a two-part formula for calculating the amount of the annual payments:

> [T]he amount of each annual payment shall be the product of—
>
> (I) the average annual number of contribution base units for the period of 3 consecutive plan years, during the period of 10 consecutive plan years ending before the plan year in which the withdrawal occurs, in which the number of contribution base units for which the employer had an obligation to contribute under the plan is the highest, and
>
> (II) the *highest contribution rate* at which the employer had an *obligation to contribute* under the plan during the 10 plan years ending with the plan year in which the withdrawal occurs.

29 U.S.C. § 1399(c)(1) (emphasis added). As discussed, § 1392(a) defines "obligation to contribute" as an obligation "arising (1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law." 29 U.S.C. § 1392(a).

### 2. "Obligation to Contribute"

The parties dispute whether the "highest contribution rate at which the employer had an obligation to contribute under the plan" includes the 10 percent surcharge that the PPA imposes on an employer as a result of the plan reaching critical status.[6] The plain language of section 1399 instructs that the PPA surcharge is *not* part of the annual payment calculation unless (1) the surcharge "aris[es]" under the CBA or "as a result of a duty under applicable labor-management relations law," and (2) the surcharge is part of the "contribution rate." See *C&S Wholesale*, 802 F.3d at 543-45 (addressing "whether 'the highest contribution rate at which the employer had an obligation to contribute' includes the 10 percent surcharge," and focusing on whether "the surcharge arises under either the CBA[] or an 'applicable labor-management relations law'" and the "question [of] whether surcharges are part of contribution rates").

#### a. "Arising Under" a Collective Bargaining Agreement

The Court first addresses whether the PPA surcharge arises under the CBA. Congress did not define what "arising . . . under" means in § 1392(a). To determine the plain meaning of the language, the Court may consult dictionary definitions. See *Transwestern Pipeline Co., LLC v. 17.19 Acres of Prop. Located in Maricopa Cty.*, 627 F.3d 1268, 1270 (9th Cir. 2010) ("When determining statutory meaning, we look first to the plain meaning of the text. Unless otherwise

---

[6] The Ninth Circuit has not yet had the opportunity to address this issue. (*See* Pl.'s Mot. Summ. J. at 1, "This is a case of first impression in the Ninth Circuit"; Def.'s Resp. & Cross-Mot. Summ. J. at 6-7, referring the Court to "every federal judge known to have considered the issue," and citing only cases from the Third Circuit; Roller Decl. Ex. B at 5, Ex. C at 5-6, reflecting that the arbitrator made the same observation).

defined, words will be interpreted as taking their ordinary, contemporary, common meaning. When determining the plain meaning of language, we may consult dictionary definitions.") (citations, quotation marks, and brackets omitted). The *Oxford English Dictionary* defines "arising" as "'occurring as the result of' or 'originating.'" *Luar Music Corp. v. Universal Music Grp., Inc.*, No. 09-2263, 2011 WL 13078375, at *3 (D. P.R. July 29, 2011) (brackets omitted) (quoting *Oxford English Dictionary* (2d ed 1997)). The Supreme Court has similarly explained that "the common usage of the word 'arise' . . . mean[s] 'come into being; originate' or 'spring up.'" *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004) (quoting the *Oxford English Dictionary* and *Black's Law Dictionary*).

The PPA surcharge did not originate from, or come into being as a result of, the CBA. Rather, the surcharge originated from, and came into being as a result of, Congress' enactment of the PPA, the statute that created the surcharge and defined the circumstances under which the surcharge applies. *See Bd. of Trs. of IBT Local 863 Pension Fund v. C&S Wholesale Grocers Inc./Woodbridge Logistics LLC*, 5 F. Supp. 3d 707, 721 (D. N.J. 2014) ("An automatic employer surcharge arises not under a CBA, but under [the PPA] . . . when the necessary conditions are met. [The PPA] simply states that the value of an automatic employer surcharge . . . is informed by the employer's CBAs; it does not magically amend the terms of those CBAs.").

The Board argues that "WPAS had an obligation to contribute an additional 10% as a surcharge in and after 2010 solely as a result of its agreement in the CBA to be a contributing employer." (Pl.'s Mot. Summ. J. at 13.) The Court disagrees. Had Congress not enacted the PPA in 2006 and imposed a surcharge on an employer when a plan reaches "critical status," as defined by the PPA, WPAS would not have incurred a surcharge based solely on its status as a contributing employer under the CBA.

PAGE 10 – OPINION AND ORDER

In summary, the Court concludes that WPAS's obligation to pay the PPA surcharge did not arise under its CBA. *See CVS Health Corp. v. Vividus, LLC*, 878 F.3d 703, 706 (9th Cir. 2017) ("If the language has a plain meaning or is unambiguous, the statutory interpretation inquiry ends there.").

### b. Arising "As a Result of a Duty Under Applicable Labor-Management Relations Law"

Under § 1392(a)(2), an "obligation to contribute" may also arise "as a result of a duty under applicable labor-management relations law." 29 U.S.C. § 1392(a). The Board cites no authority to support its argument that the PPA qualifies as "applicable labor-management relations law." (Pl.'s Mot. Summ. J. at 20-21.) Rather, courts have consistently interpreted "applicable labor-management relations law" to mean the National Labor Relations Act ("NLRA"). *See, e.g., Laborers Health and Welfare Tr. Fund for N. Cal. v. Advanced Lightweight Concrete Co., Inc.*, 484 U.S. 539, 545-46 (1988) (holding that the "obligation to contribute" under ERISA "is defined for the purposes of the withdrawal liability portion of the statute in language that unambiguously includes both the employer's contractual obligations and any obligation imposed by the NLRA" and noting "[t]hat definition is significant because it demonstrates that Congress was aware of the two different sources of an employer's duty to contribute to covered plans"); *see also I.A.M. Nat'l Pension Fund, Ben. Plan C v. Schulze Tool and Die Co., Inc.*, 564 F. Supp. 1285, 1296 (N.D. Cal. 1983) (noting that the NLRA is "the most obvious meaning" of the phrase "applicable labor-management relations law" as used in 29 U.S.C. § 1392(a)).

In summary, the Court finds that WPAS's obligation to pay the PPA surcharge did not arise as a result of its duties under any applicable labor-management relations law, and therefore

concludes that WPAS did not have an "obligation to contribute" the PPA surcharge under 29 U.S.C. § 1392(a).

### 3. "Highest Contribution Rate"

Even if the PPA surcharge arose under the CBA or as the result of a duty under labor-management relations law, the PPA surcharge may not be included in the annual payment calculation unless it is also part of WPAS's "highest contribution rate." *See C&S Wholesale*, 802 F.3d at 544 ("Even if . . . the surcharge arises under the PPA and assuming that the PPA is an 'applicable labor-management relations law,' the surcharge cannot be added to [the employer's equal] annual payments unless it is part of the highest contribution *rate*."); *see also* 29 U.S.C. § 1399(c)(1) (specifying that the employer's annual payments are based on the "highest contribution rate" at which the employer had an "obligation to contribute" under the plan).

Congress did not define "contribution rate" in § 1399(c)(1). *See C&S Wholesale*, 802 F.3d at 544 ("'Contribution rate' is widely used throughout the statute, but never explicitly defined."). Thus, in determining the plain meaning of the language, it is appropriate for the Court to consult common dictionary definitions. *See Transwestern*, 627 F.3d at 1270 ("'When determining the plain meaning of [undefined] language, we may consult dictionary definitions.'" (quoting *Af–Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1088 (9th Cir. 2007))); *see also Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 933 F.3d 1088, 1093 (9th Cir. 2019) ("When a statute does not define a term, we typically give the phrase its ordinary meaning. To determine the ordinary meaning of a word, 'consulting common dictionary definitions is the usual course.'") (citation and quotation marks omitted).

*Webster's Dictionary* defines "contribution" as "the act of contributing," and the verb "contribute" as "to give or to grant in common with others (as to a common fund or to a common purpose): give (money or other aid) for a specified object." *In re HLM Corp.*, 165 B.R. 38, 40

PAGE 12 – OPINION AND ORDER

(Bankr. D. Minn. 1994) (citation and quotation marks omitted). These definitions "impl[y] some sort of voluntary act." *Id.*; *see also Municipality of Mt. Lebanon v. Gillen*, 151 A.3d 722, 729 (Pa. Commw. Ct. 2016) (reflecting that a more recent version of *Webster's Dictionary* defines "contribution" as "something that is contributed : a sum or thing voluntarily contributed"). *Ballantine's Law Dictionary* defines "rate" as "a unit by which a calculation is made." *Med. Malpractice Ins. Ass'n v. Cmty. Gen. Hosp. of Sullivan Cty.*, 423 N.Y.S.2d 666, 668 (N.Y. App. Div. 1980) (citation and quotations omitted); *see also Fisher & Co., Inc. v. Dep't of Treasury*, 769 N.W.2d 740, 744 (Mich. Ct. App. 2009) (noting that "rate" means "the amount of a charge or payment with reference to some basis of calculation") (citation omitted).

Taken together, these definitions support that the ordinary meaning of "contribution rate" is a unit used to calculate an amount that someone has agreed to give. As relevant here, WPAS "agreed" in the CBA to a "contribution rate" of $2.95. (Miller Decl. Ex. 1, at 3, 18.) A statutorily mandated surcharge does not fit within the ordinary meaning of "contribution rate." *See In re HLM Corp.*, 165 B.R. at 40 (stating that a payment was not a "contribution" because it was "statutorily mandated," not "voluntary"); *cf. C&S Wholesale*, 802 F.3d at 545 (explaining that "contribution rates are set by CBAs while surcharges are set by statute[,]" and "[n]othing in the statutory scheme suggests that surcharges, when applicable, amend the underlying terms of employers' CBAs" and "[y]et, that is the result of considering surcharges as [part of] contribution rates set in the CBAs").

The broader context of the statutory scheme also supports the conclusion that the PPA surcharge is not part of the "contribution rate." *See generally Geo-Energy Partners-1983 Ltd. v. Salazar*, 613 F.3d 946, 956 (9th Cir. 2010) ("'The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used,

PAGE 13 – OPINION AND ORDER

and the broader context of the statute as a whole.'") (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340-41 (1997))). On its face, the PPA requires a surcharge based on a percentage of the employer's contributions, not the employer's contribution rate. *See* 29 U.S.C. § 1085(e)(7)(A) (obligating employers to pay a surcharge based on "10 percent of the contributions otherwise so required" under the CBA); *id.* § 1085(e)(7)(B) (requiring that surcharges "due and payable on the same schedule as the contributions on which the surcharges are based").

"Contribution" and "contribution rate" are consistently treated as distinct terms under ERISA. *C&S Wholesale*, 802 F.3d at 545 ("A close reading of ERISA further reinforces our conclusion that contributions are not to be conflated with contribution rates."). The contribution rates set forth in the CBA determine the total value of the employer's contributions to the plan: "[T]he 'contribution rates' set forth in an employer's CBAs with a multiemployer pension plan are distinct from the 'contributions' that the employer generally pays to the plan. Although the contribution rates help determine the total value of the contributions, the contributions do not determine the contribution rates." *C&S Wholesale*, 5 F. Supp. 3d at 722; *see also C&S Wholesale*, 802 F.3d at 544 (stating that "[i]t is clear . . . as a matter of common sense that contributions are distinct from contribution rates"); *see also* Partial Final Award (Roller Decl. Ex. C at 7-8) (concluding that the Board "conflates 'contributions' with 'contribution rates' in contravention of the directions given in the Third Circuit and other authorities").

For all of these reasons, the Court concludes that the PPA surcharge is not part of WPAS's "highest contribution rate," and therefore cannot be included in the calculation of WPAS's annual payments.

### 4.     Legislative History

The Board's argument that the PPA surcharge must be included in calculating WPAS's annual payment is based in large part on the passage of the MPRA in 2014. (Pl.'s Suppl. Br. at 1-

PAGE 14 – OPINION AND ORDER

8.) As discussed above, the MPRA amended section 1085, and the statute now explicitly provides that "automatic surcharges [shall] 'be disregarded . . . *in determining the highest contribution rate* under [29 U.S.C. § 1399(c)].'" *C&S Wholesale*, 802 F.3d at 546 (quoting 29 U.S.C. § 1085(g)(2) (2014)). The Joint Committee on Taxation's report explained the provision:

> The provision consolidates the present-law rules for the disregard of benefit reductions and employer surcharges in determining withdrawal liability with respect to a multiemployer plan in critical status. *In addition, under the provision, employer surcharges are disregarded in determining an employer's highest previous rate of contribution to the plan*. The provision also adds new rules relating to the disregard of contribution increases under a funding improvement plan in the case of a multiemployer plan in endangered status or a rehabilitation plan in the case of a multiemployer plan in critical status.
>
> Under the new rules, if an increase in contribution rate or other increase in contribution requirements . . . is required or made to enable a multiemployer plan to meet the requirements of a funding improvement or rehabilitation plan, the increase is generally disregarded in determining the allocation of unfunded vested benefits to an employer and an employer's highest contribution rate.
>
> . . . .
>
> The provision is effective with respect to . . . surcharges the obligation for which accrues on or after December 31, 2014.

(Pl.'s Suppl. Br. Ex. 6, at 5) (emphasis added). Relying on this explanation from the Joint Committee on Taxation, the Board argues that "[g]iven Congress's action in 2014 to exclude surcharges that accrue after December 31, 2014 from [an employer's] withdrawal liability payment computation, the only plausible construction of the statute is that surcharges were not excluded from the 'highest contribution rate' in the withdrawal liability payment computation before the 2014 MPRA amendment." (Pl.'s Suppl. Br. at 1-2.)

The Court is not persuaded by the Board's argument. First, the relevant statutory language is plain and unambiguous, and therefore it is inappropriate for the Court to consider

PAGE 15 – OPINION AND ORDER

legislative history, policy considerations, or other extrinsic material. *See CVS Health Corp.*, 878 F.3d at 706 ("If the language has a plain meaning or is unambiguous, the statutory interpretation inquiry ends there."); *Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1042 (9th Cir. 2013) ("[D]ispositively, it is improper to consider legislative history in this instance. '[T]he authoritative statement is the statutory text, not the legislative history or any other extrinsic material.' Consequently, 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) and *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000))).

Even if the Court were to consider legislative history, it would consider the legislative history of the statute the Court must interpret, i.e., the MPPAA, enacted in 1980, or the PPA, enacted in 2006, not the intent of a Congress enacting subsequent legislation. The Supreme Court has cautioned that courts must "begin with the oft-repeated warning that 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980) (quoting *United States v. Price*, 361 U.S. 304, 313 (1960)); *see also Slaven v. BP Am., Inc.*, 973 F.2d 1469, 1475 (9th Cir. 1992) (stating that "post-enactment legislative history is generally considered to be of minimal assistance in interpreting a statute," and that "'courts avoid deducing the intent behind one act of Congress from the implication of a second act passed years later'") (citation omitted).

The Court declines to draw any conclusions about the proper interpretation of then-existing law at the time Congress enacted the MPRA, as it is the function of the courts, not a subsequent Congress, to interpret the meaning of a statute. *See C&S Wholesale*, 802 F.3d at 546

(explaining that "'[i]t [remains] the function of the courts and not the Legislature . . . to say what an enacted statute means'" (quoting *Pierce v. Underwood*, 487 U.S. 552, 566 (1988))); *id.* ("[B]ecause of the dearth of legislative history for the MPRA and lack of clear statutory language, it would be a hazardous venture for us to draw any conclusions from the enactment of the MPRA.").

Even if the Court were to consider the legislative history of the MPRA, it would be just as reasonable to view the MPRA as clarifying, rather than repealing, existing law. *See* Pl.'s Suppl. Br. Ex. 6, at 5 (describing the provision regarding employer surcharges without referring to the provision as a "new rule," as the committee report described other provisions of the MPRA); *see also* Roller Decl. Ex. A-7, at 30 (reflecting the arbitrator's conclusion that "[t]here has been no showing on this record of any Legislative History regarding MPRA that reflects an understanding by Congress that the changes were other than clarifying in nature" and "there has been no showing of any clear Congressional understanding or intent as to whether, prior to MPRA becoming effective, PPA surcharges were to be treated as part of a contributing

For all of these reasons, the Court finds that the arbitrator correctly concluded that the Board should not have included the PPA surcharge in calculating WPAS's annual withdrawal liability payment.

///

///

///

///

///

///

PAGE 17 – OPINION AND ORDER

## CONCLUSION

For the reasons stated, the Court AFFIRMS the arbitrator's finding that $2.95 was WPAS's "highest contribution rate," and therefore DENIES the Board's motion for summary judgment (ECF No. 14) and GRANTS WPAS's cross-motion for summary judgment (ECF No. 16).

**IT IS SO ORDERED.**

DATED this 19th day of May, 2020.

_____
STACIE F. BECKERMAN
United States Magistrate Judge